UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| C.A. STOVER,<br>                    Plaintiff,<br><br>         vs.<br><br>KILOLO KIJAKAZI, ACTING<br>COMMISSIONER OF THE SOCIAL<br>SECURITY ADMINISTRATION;<br><br>                    Defendant. | 5:21-CV-05028-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

**INTRODUCTION**

Plaintiff, C.A. Stover, seeks judicial review of the Commissioner's final

decision denying her application for social security disability benefits under

Title II of the Social Security Act.[1]  Ms. Stover has filed a *pro se* complaint and

---

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called
"Title II" benefits.  Receipt of both forms of benefits is dependent upon whether
the claimant is disabled.  The definition of disability is the same under both
Titles.  The difference—greatly simplified—is that a claimant's entitlement to
SSD/DIB benefits is dependent upon one's "coverage" status (calculated
according to one's earning history), and the amount of benefits are likewise
calculated according to a formula using the claimant's earning history.  There
are no such "coverage" requirements for SSI benefits, but the potential amount
of SSI benefits is uniform and set by statute, dependent upon the claimant's
financial situation, and reduced by the claimant's earnings, if any.  There are
corresponding and usually identical regulations for each type of benefit.  See,
e.g., 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-
step procedure under Title II and Title XVI).  Ms. Stover filed her application for
Title II benefits only.  Her coverage status for SSD benefits expires on
September 30, 2020.  T14.  In other words, in order to be entitled to Title II
benefits, Ms. Stover must prove disability on or before that date.

motion to reverse the Commissioner's final decision denying her disability benefits and to remand the matter to the Social Security Administration for further proceedings.  See Docket Nos. 1, 33.  The Commissioner has filed his own motion seeking affirmance of the agency's decision below.  See Docket No. 36.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g).  The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

## FACTS[2]

### A.    Procedural Facts

Plaintiff C.A. Stover applied for Title II benefits on November 17, 2014, alleging an inability to work beginning March 16, 2014 (AR[3] 266).  Ms. Stover's first hearing was on November 15, 2016 (AR 57), and the first administrative law judge (ALJ) decision denying benefits was dated April 12, 2017 (AR 154-64).

The Appeals Council remanded to the ALJ to conduct a new hearing, comply with procedures to obtain evidence, and comply with evidence proffer procedures (AR 11).  The ALJ was also directed to consider Ms. Stover's

---

[2] These facts are recited from the parties' stipulated statement of facts (Docket No. 27).  The court has made only minor grammatical and stylistic changes.

[3] All AR cites are to the Administrative Record or the Record Transcript related to Ms. Stover's application for disability insurance benefits.

residual functional capacity and provide appropriate rationale with specific references to the evidence supporting the limitations.  Id.

After remand, the ALJ denied Ms. Stover's Title II application for benefits on June 26, 2020 (AR 11-30).  At step 1, the ALJ determined that Ms. Stover met the insured status through September 30, 2020, and had not engaged in substantial gainful activity during the relevant time (AR 14).

At step 2, the ALJ found that Ms. Stover had chronic obstructive pulmonary disease (COPD); migraine headaches; residual effects of wrist ganglion following removal; and depression, anxiety, post-traumatic stress, and polysubstance abuse disorders.  Id.  At step 2, the ALJ found that Ms. Stover's feet and back condition did not amount to severe impairments (AR 14-15).

At step 3, the ALJ found that Ms. Stover did not meet a presumptively disabling impairment (AR 15).

At the residual functional capacity step, the ALJ found that Ms. Stover could do light work with postural, environmental, and mental limitations (AR 17).  At step 4, the ALJ found that Ms. Stover could not do her past work as a chiropractic assistant and administrative assistant (AR 29).

The ALJ found that Ms. Stover was a younger individual with at least a high school education.  Id.  At step 5, the ALJ found that Ms. Stover could work as a turner, marker, and garment sorter (AR 30).  The Appeals Council denied Ms. Stover's request for review on March 8, 2021 (AR 1).

3

**B.    APPLICATION DOCUMENTS AND HEARING FACTS**

Ms. Stover alleged disability due to COPD, addiction, neck and back impairments, depression, and chronic pain (AR 321).  In her January 2015 function report, Ms. Stover reported under Personal Care/Dress: "Don't know what to wear colors or not"; under bathe: "It takes to much effort" and then crossed it out; under care for hair: "N/A"; under shave: "N/A"; and under feed self: "Sometimes I forget" (AR 333).

In her August 2015 function report, Ms. Stover complained of erratic sleep (AR  365), and feeling overwhelmed (AR 365).  She wrote that depending on her COPD, she could clean, sweep, mop, dust, and vacuum (AR 366).  In the same function report, Ms. Stover responded to "How do your illnesses, injuries, or conditions limit your ability to work? by stating: "Every where I go I'm blamed for all the craziness, insanity, war in the world" (AR 364).

In her application documents, Ms. Stover stated that she was not sure why, but she could not go out alone (AR 367).  She stated that she had a variable ability to do sports, hiking, rock finding, watching television, and riding bicycles (AR 368).  Ms. Stover wrote that she did not go anywhere on a regular basis.  Id.

At Ms. Stover's May 13, 2020 hearing, the ALJ advised Ms. Stover that she could be represented by an attorney or a nonattorney representative, but Ms. Stover stated that she wished to proceed without a representative (AR 95-96).  Ms. Stover testified that she had an associate degree and past work as a chiropractic assistant and administrative assistant (AR 100-04).  Ms. Stover

4

testified that she drove every day, but after driving for long period (an hour), she got arm numbness (AR 101).  Ms. Stover testified that she had obtained a full-time position on May 1, 2020, at the courthouse (AR 102).

Ms. Stover testified that after she became sober, her headaches worsened (AR 105).  Ms. Stover testified that she had received relief with medication and occupational therapy (AR 106).  Ms. Stover testified that since she became sober, her anxiety had improved.  Id.  While she experienced exacerbations, she testified that these had not happened recently (AR 108).  Ms. Stover testified that in 2014, she had migraines two or three times a week, a frequency that lasted three or four years (AR 108-09).  Ms. Stover testified that starting two or three years ago, the frequency declined to maybe a couple of times a month (AR 109).  At the time of the hearing, Ms. Stover thought she was having one migraine a month and sometimes it would be less than once a month (AR 110).

Jerry Gravatt, the vocational expert, considered a person with the residual functional capacity the ALJ assigned to Ms. Stover (AR 114-15).  Mr. Gravatt stated that the hypothetical person could work as a tuner, marker, and garment sorter at a thrift store (AR 115).  The ALJ asked Mr. Gravatt: "If we have a person, who for any reason is going to be off-task more than 15 percent of the typical eight-hour workday or they're going to miss more than two days of work per month, will there be jobs in the national economy?"  Id.  Mr. Gravatt responded by saying: "No."

Ms. Stover's ICLM Summary of Total Earnings for 2014 was listed as $500 (AR 285).  Ms. Stover's FICA Earnings for 2014 was $631.50, for 2015

5

was $0, and for 2016 was $214.20 (AR 291).  Ms. Stover had no employment

earnings in 2015 or 2016 (AR 276-77).

## C.   MEDICAL FACTS

On April 1, 2013, Behavior Management Systems Needs Assessment

Update, the therapist described Ms. Stover as having a depressed mood, slowed

thought processes, and poor insight, judgment, and ability to make decisions

(AR 515; see also AR 695-97).  The therapist indicated through check marks

that Ms. Stover had, "Frequent crisis contacts with the center for more than six

months as a result of severe and persistent psychiatric symptomology" and

"Maintained with psychotropic medication for at least one year" (AR 516).  The

therapist checked that Ms. Stover: "Exhibits inappropriate social behavior

which results in concern by the community and/or requests for mental health

service by the judicial/legal systems; Is unable to perform basic living skills

without assistance; Is unable to perform basic living skills without assistance;

Is unemployed or has markedly limited job skills and/or poor work history;"

and "Requires public financial assistance for out of hospital maintenance."  Id.

This document is dated before the relevant time.

In July 2013, Theodore Millon, Ph.D., D.Sc., assessed Ms. Stover using

the Millon Clinical Multiaxial Inventory-III (MCMI-III) (AR 500).  Dr. Millon

stated that Plaintiff was experiencing a severe mental disorder (AR 501).

Under stress, Ms. Stover might claim that simple responsibilities were too

demanding.  Id.  Ms. Stover's response style could show a tendency to magnify

her illness, complain, self-pity, or convey extreme vulnerability (AR 503).

6

Whatever the impetus, Ms. Stover's scores might be somewhat exaggerated.  Id.
Dr. Millon interpreted Ms. Stover's scores to generally describe a patient and
what Ms. Stover might or may do (AR 503-04).  Dr. Millon described Ms. Stover
as apathetic, depressed, self-doubting, shy, and sad (AR 504).  Dr. Millon
suggested that Ms. Stover had an anxiety disorder, a mild to moderately severe
manic episode, and a pattern of maladaptive functioning (AR 504-06).

In July 2014, a therapist at Behavior Management Systems filled out a
discharge summary for Ms. Stover (AR 943).  The therapist stated that
Ms. Stover was admitted for complaints of stress and depression that she had
experienced consistently for the last three months and on and off for the past
year.  Id.  Ms. Stover was frequently absent for services, reengaging for a time
and then dropping out (AR 944).

In September 2014, Ms. Stover complained of a cough and L. Robles,
M.D., diagnosed a viral syndrome, bronchial asthma, and chronic rhinitis
(AR 818).  He also diagnosed COPD (AR 822); see also (AR 548-50).  That same
month, Dr. Robles wrote that Ms. Stover "was unable to assist to work from
June/24/2014 to Sept./15/2014.  [She] is under medical evaluation and
treatment" (AR 548).

In October 2014, Daniel Ostendorf, M.S., Respiratory Care Practitioner
(R.C.P.), saw Ms. Stover for chronic cough complaints (AR 826).  Because
Ms. Stover was coughing, Mr. Ostendorf could not complete pulmonary
function testing at the time.  Ms. Stover stated she was always tired but able to
stay alert during her long drives between Rapid City and home.  Id.

7

In April 2015, Avery Sides, M.D., saw Ms. Stover for medication refills (AR 653). Ms. Stover did not have any medication concerns (AR 654). Ms. Stover denied headaches, back pain, shortness of breath, dysuria, hematuria, and anxiety, decreased concentration, and panic attacks. Id. Upon examination, Dr. Sides described all systems as normal, with Ms. Stover's asthma well controlled with medication (AR 655).

In December 2016, Brett Valette, Ph.D., evaluated Ms. Stover's mental functioning (AR 669). Ms. Stover relayed that she lived in an apartment by herself and independently did her cleaning, dishes, laundry, grocery shopping, cooking, and dressing. Ms. Stover could follow a storyline of a 30-minute show. She could follow a movie story line. Ms. Stover liked reading history and novels (AR 670). Ms. Stover denied any current depression or PTSD (AR 670-71). On examination, Dr. Valette concluded that Ms. Stover could pay attention and stay focused throughout the evaluation (AR 671). She appeared to have intact cognitive functioning and intact mental status. Id.

In May 2019, James Parker, Ph.D., evaluated Ms. Stover's mental functioning. Ms. Stover recounted treatment for substance abuse in 2014 and had been generally abstinent since this time. Ms. Stover stated that she presently got odd jobs, felt financial stress, and felt overwhelmed (AR 1122). Ms. Stover complained of tension and migraine headaches. Id. Dr. Parker described her as well composed, with intact cognition. Id. Ms. Stover had logical and practical thought processes. Id. Dr. Parker diagnosed generalized anxiety disorder and prescribed medication. Id.

8

On June 12, 2019, Dr. Parker described Ms. Stover as having an anxious and sad mood, normal cognition, and some possibly fanciful thinking but in touch with reality (AR 1127).  Dr. Parker's impression was that Ms. Stover appeared fragile.  Id.  He recommended that Ms. Stover start journaling (AR 1128).

Ms. Stover's June 17, 2019, visit with Dr. Parker was, in part, to consider her application for Social Security benefits "in the hope of not working for an unspecified amount of time due to psychological symptoms and a diagnosis of multiple substance disorder in remission as well as generalized anxiety disorder" (AR 1129).  Ms. Stover hoped to eventually return to work but was presently overwhelmed.  Id.  She had stopped working at a bar because she felt it was incompatible with her sobriety.  Id.

After using a standardized test, Dr. Parker stated that the exaggeration scale meant that Ms. Stover's results were not valid or reliable (AR 1130).  Other test results suggested Ms. Stover was easily overwhelmed and emotionally fragile, had a high degree of anxiety, made poor choices, and would have difficulty in a work setting (AR 1130-31).  Dr. Parker concluded that full-time work for the next 6 to 12 months would be problematic and Ms. Stover should not work at night (AR 1131).

In June 2019, Dr. Sides used a form to evaluate Ms. Stover's physical functioning.  Dr. Sides estimated that Ms. Stover could frequently lift 11 to 20 pounds and occasionally lift 21 to 100 pounds (AR 932).  Dr. Sides estimated that Ms. Stover could, without interruption, sit, stand, and walk four hours

each day (AR 933).   Dr. Sides estimated that Ms. Stover could sit, stand, and walk a total of six hours for each action.  Id.  Dr. Sides estimated that Ms. Stover could frequently reach, push, and pull, and continuously reach, handle, finger, and feel (AR 934).  Dr. Sides estimated that Ms. Stover could continuously engage in a number of postures and work in a number of environments (AR 935-36).  Dr. Sides stated that Ms. Stover did not have any physical limitations (AR 936).

In June 2019, James Parker, Ph.D., evaluated Ms. Stover's mental functioning (AR 939).  Dr. Parker checked that Ms. Stover had the ability to work with simple instructions, mild to moderate limits with complex instructions.  Id.  Ms. Stover had mild limits in interacting with others, though Dr. Parker thought Ms. Stover had difficulty with interpersonal relations when under pressure (AR 940).  Substance abuse exacerbated Ms. Stover's anxiety.  Id.

In May 2020, Nathan Ritterbush, D.C., wrote a letter stating that he had treated Ms. Stover since March 2020 to reduce migraine headaches (AR 1311).  Dr. Ritterbush treated Ms. Stover with chiropractic techniques and acupuncture.  Id.

## DISCUSSION

### A.   Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by "substantial evidence [i]n the record as a whole."  42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th

10

Cir. 2009) (citing <u>Johnson v. Chater</u>, 108 F.3d 178, 179 (8th Cir. 1997)).
"[S]ubstantial evidence [is] defined as 'more than a mere scintilla.  It means
such relevant evidence as a reasonable mind might accept as adequate to
support [the Commissioner's] conclusion.' " <u>Klug v. Weinberger</u>, 514 F.2d 423,
425 (8th Cir. 1975) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)).
"This review is more than a search of the record for evidence supporting the
[Commissioner's] findings, and requires a scrutinizing analysis, not merely a
rubber stamp of the [Commissioner's] action." <u>Scott ex rel. Scott v. Astrue</u>, 529
F.3d 818, 821 (8th Cir. 2008) (internal quotations and citations omitted).  Yet,
"[i]n conducting [its] limited and deferential review of the final agency
determination under the substantial-evidence standard, [the court] must view
the record in the light most favorable to that determination.  <u>Chismarich v.</u>
<u>Berryhill</u>, 888 F.3d 978, 980 (8th Cir. 2018).

        In assessing the substantiality of the evidence, the evidence that detracts
from the Commissioner's decision must be considered, along with the evidence
supporting it.  <u>Minor</u>, 574 F.3d at 627.  The Commissioner's decision may not
be reversed "merely because substantial evidence would have supported an
opposite decision." <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993)
(quoting <u>Locher v. Sullivan</u>, 968 F.2d 725, 727 (8th Cir. 1992)); <u>Reed v.</u>
<u>Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005).  "[I]f it is possible to draw two
inconsistent positions from the evidence and one of those positions represents
the [Commissioner's] findings," the Commissioner must be affirmed.  <u>Oberst v.</u>
<u>Shalala</u>, 2 F.3d 249, 250 (8th Cir. 1993) (quoting Robinson v. Sullivan, 956

F.2d 836, 838 (8th Cir. 1992)).  "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record."  <u>Mittlestedt v. Apfel</u>, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed.  <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g).  Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis.  Erroneous interpretations of law will be reversed.  <u>Walker v. Apfel</u>, 141 F.3d 852, 853 (8th Cir. 1998) (citations omitted).  The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  <u>Smith</u>, 982 F.2d at 311 (finding "appropriate deference" should be given to the SSA's interpretation of the Social Security Act).

**B.    The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1)(A); 20 C.F.R. § 404.1505.[4]  The impairment must be severe, making the claimant unable to do his previous

_____

[4] Although Ms. Stover has applied for both Title II and Title XVI benefits, for the sake of simplicity, the court herein cites to only the regulations applicable to Title II where the corresponding Title XVI regulation is identical.  It is understood that both Titles are applicable to Ms. Stover's application.  Any divergence between the regulations for either Title will be noted.

work, or any other substantial gainful activity which exists in the national

economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is

disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB

applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R.

§ 404.1520.  The five steps are as follows:

> **Step One**: Determine whether the applicant is presently engaged
> in substantial gainful activity. 20 C.F.R. § 404.1520(b).  If the
> applicant is engaged in substantial gainful activity, she is not
> disabled and the inquiry ends at this step.
>
> **Step Two**: Determine whether the applicant has an impairment or
> combination of impairments that are *severe*, i.e., whether any of
> the applicant's impairments or combination of impairments
> significantly limit her physical or mental ability to do basic work
> activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment
> or combination of impairments, the applicant is not disabled and
> the inquiry ends at this step.  NOTE: the regulations prescribe a
> special procedure for analyzing mental impairments to determine
> whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821
> (8th Cir. 1992); 20 C.F.R. § 404.1520a.  This special procedure
> includes completion of a Psychiatric Review Technique Form
> (PRTF).
>
> **Step Three**: Determine whether any of the severe impairments
> identified in Step Two meets or equals a "Listing" in Appendix 1,
> Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment
> meets or equals a Listing, the applicant will be considered disabled
> without further inquiry.  Bartlett v. Heckler, 777 F.2d 1318, 1320
> n.2 (8th Cir. 1985).  This is because the regulations recognize the
> "Listed" impairments are so severe that they prevent a person from
> pursuing any gainful work.  Heckler v. Campbell, 461 U.S. 458,
> 460 (1983).  If the applicant's impairment(s) are *severe* but do not
> meet or equal a *Listed impairment*, the ALJ must proceed to step
> four.  NOTE: The "special procedure" for mental impairments also
> applies to determine whether a severe mental impairment meets or
> equals a Listing.  20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe*) to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e)-(f); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five. 20 C.F.R. §§ 404.1520(f).

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 404.1520(g).

## C.    **Burden of Proof**

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at step five. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994). "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting is "a long-standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 n.3 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

14

**D.   Assignments of Error**

Interpreting Ms. Stover's *pro* se pleading liberally, she appears to raise issues at steps one through five of the ALJ's analysis.  She may be arguing that the ALJ erred at step two by failing to take into consideration Ms. Stover's mental limitations.  Docket No. 33 at p. 1 (writing "There were reports to be considered from descriptions and observations of Ms. Stover's limitations from her impairment(s), including limitations that result from her mental limitations provided by herself CFR 404.1529, that were not taken into observation.")  In her motion to reverse, Ms. Stover also clearly argues the ALJ erred by not finding her disabled at step three of the sequential analysis based on her mental impairments.  Id.  She also assigns error at steps four and five asserting she does not have the residual functional capacity to perform the jobs of turner, marker, or garment sorter.  Id.

**1.   New "Testimony" in Ms. Stover's Briefs**

In her brief in support of her motion to reverse and in her reply brief, Ms. Stover attempts to interject new evidence or testimony by personally commenting on the evidence and expanding on it.  For example, she states she has experienced long periods of sobriety since 2013 but that her mental disabilities were still extant when she was sober.  Docket No. 40 at p. 5.  She includes "testimony" about trauma she experienced from various sources.  Id.  She expands on her own function report and claims that, although she reported that she could live by herself independently and clean, do laundry,

15

shop for groceries, cook, and groom herself, she did not do these things very often.  Id. at p. 6.

This court's review of the Commissioner's decision is limited to reviewing the body of evidence that was before the ALJ and deciding whether that evidence constitutes substantial evidence supporting the conclusion reached by the ALJ.  42 U.S.C. § 405(g); Minor, 574 F.3d at 627.   This court cannot, absent extremely limited circumstances which Ms. Stover has not invoked, receive and consider new evidence that was not before the agency.  20 C.F.R. § 404.970(b); Mackey v. Shalala, 47 F.3d 951, 952 (8th Cir. 1995).  Therefore, this court confines its consideration to the evidence which was before the ALJ and does not consider Ms. Stover's *post hoc* commentary, additions, and rationalizations.

### 2.    Whether the ALJ Erred at Step Two

To reiterate, the question at step two is whether the applicant has an impairment or combination of impairments that are *severe*—that is, whether any of the applicant's impairments or combination of impairments significantly limit her physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  It is the claimant's burden at demonstrate a severe medically determinable impairment at step two, but that burden is not difficult to meet and any doubt about whether the claimant met her burden is resolved in favor of the claimant.  Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007); Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001); and Dewald v. Astrue, 590 F. Supp. 2d 1184, 1199 (D.S.D. 2008) (citing SSR 85-28).  "An impairment or

16

combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1522(a).  Basic work activities include, but are not limited to:  walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, use of judgment; responding appropriately to supervisors and co-workers and usual work situations, dealing with changes in a routine work setting, and understanding, carrying out, and remembering simple instructions.  Id. at (b).

At step two, only medical evidence is evaluated to assess the effects of an impairment on the ability to do basic work activities.  Social Security Ruling ("SSR") 85-28, *4 (1/1/85).[5]  Therefore, subjective complaints of the claimant are not part of the step two analysis.  Id.  It is not clear to the court whether Ms. Stover is raising an issue regarding step two.  If she is, it appears she argues (1) the ALJ erroneously concluded her mental impairments were not severe and (2) the ALJ erroneously ignored Ms. Stover's own subjective assessments of her impairments.  Docket No. 33 at p. 1.  Regarding the latter argument, a claimant's subjective complaints or descriptions are not relevant at step two.  SSR 85-28, *4 (1/1/85).  Only medical evidence is relevant at step two.  Id.  Therefore, if the ALJ failed to take into account Ms. Stover's own subjective assessments at step two, that failure was not error.

---

[5] Social Security Rulings are agency rulings "published under the authority of the Commissioner of Social Security and are binding on all components of the Social Security Administration." 20 CFR § 422.408 (1989); see Heckler v. Edwards, 465 U.S. 870, 873, n. 3 (1984).

With regard to the former argument, the ALJ *did* find that Ms. Stover's mental impairments were severe at step two.  Specifically, the ALJ found Ms. Stover suffered from the following severe mental impairments:  depressive disorder, anxiety disorder, post-traumatic stress syndrome (PTSD), and polysubstance abuse disorder.[6]  AR 14.  Accordingly, any argument to the contrary does not find support in the administrative record.  The court concludes the ALJ's step two decision was supported by substantial evidence in the record.  The court rejects any assertion by Ms. Stover that the step two decision was erroneous.

### 2.    Whether the ALJ Erred at Step Three

To qualify for disability at step three, a claimant must establish that their impairment meets or equals a listing.  <u>Johnson v. Barnhart</u>, 390 F.3d 1067, 1070 (8th Cir. 2004).

> An impairment meets a listing only if it "meet[s] all of the specified medical criteria." <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530, (1990). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." <u>Id.</u> To prove that an impairment or combination of impairments equals a listing, a claimant "must present medical findings equal in severity to all the criteria for the one most similar listed impairment." <u>Id.</u> at 531.

<u>KKC ex rel. Stoner v. Colvin</u>, 818 F.3d 364, 370 (8th Cir. 2016).

---

[6] The ALJ also found Ms. Stover suffered from the following physical impairments:  chronic obstructive pulmonary disease (COPD), migraine headaches, and residual effects of wrist ganglion following removal.  AR 14. The ALJ found Ms. Stover's bilateral foot pain and back pain were nonsevere because she had not sought and received ongoing treatment for these conditions.  AR 14-15.

For Stover to be considered disabled from a mental impairment at step three, she must demonstrate that she meets either paragraph B criteria or paragraph C criteria.  See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A2) (1989), Listings ("Listings") §§ 12.00, 12.04, 12.06 and 12.15.  The ALJ concluded that Ms. Stover did not meet either the paragraph B or paragraph C criteria.  AR 16-17.  Ms. Stover takes issue with the ALJ's analysis under both paragraphs.

### a.   Paragraph B Criteria

As to the paragraph B criteria, Ms. Stover asserts the ALJ erred by not finding she had at least one extreme or two marked limitations in a broad area of functioning.  Docket No. 33 at p. 2.  In order to meet the paragraph B criteria, Ms. Stover must have demonstrated that her mental impairments resulted in at least one extreme or two marked limitations in one of the following broad areas of functions:

- understanding, remembering, or applying information;

- interacting with others;

- concentrating, persisting, or maintaining pace; or

- adapting or managing themselves.

Listing §§ 12.00.A.2.b and 12.00.E.  Unlike step two, the determination at step three is made by considering all the evidence, not just medical evidence.  Id. at § 12.00.C.6.c.

The ALJ found only mild and moderate limitations in the paragraph B criteria.  AR 16.  Specifically, the ALJ found Ms. Stover had "mild" limitations in understanding, remembering, or applying information.  Id.  The ALJ found

she had "moderate" limitations in interacting with others, adapting or
managing herself, and concentrating, persisting or maintaining pace.  Id.

An "extreme" limitation is "the inability to function independently,
appropriately or effectively, and on a sustained basis."  Listing § 12.00.F.2.e.
A "marked" limitation means that one's ability to "function independently,
appropriately, effectively, and on a sustained basis is seriously limited."  Id. at
§12.00.F.2.d.  A "moderate" limitation means the claimant has a "fair" ability to
function in the area independently, effectively and on a sustained basis.  Id. at
§ 12.00.F.2.c.  A "mild" limitation means the claimant is only "slightly limited"
in their ability to function independently, effectively and on a sustained basis
in the area.  Id. at § 12.00.F.2.b.

Relying on her own January 2015 function report and "evidence provided
herein by Doctors, BMS, Keystone Treatment Center, [and] Dr. Parker" (docket
no. 33 at p. 2), Ms. Stover asserts the evidence shows she was extremely or
markedly limited, not mildly or moderately limited.

The ALJ discussed the following areas of functioning and then discussed
the evidence which supported the ALJ's conclusion that Ms. Stover was either
mildly or moderately limited in that area:

> **Understanding, remembering or applying information**—the ALJ
> found Ms. Stover to be "mildly" limited because Dr. Valette's
> evaluations found she could recall three out of three items on
> short-term testing, and two out of three items after five minutes.
> Also, she was able to correctly calculate serials sevens from 100 to
> 51 in 30 seconds.  AR 16 (citing AR 671).[7]  The ALJ also relied on

---

[7] The record cited by the ALJ was a psychological consultative exam conducted
on Ms. Stover by Dr. Brett Vallette, PhD on December 21, 2016.  AR 669-71.
Dr. Vallette is a clinical psychologist.  AR 671.

evidence that Ms. Stover had no cognitive difficulties and that she could improve her symptoms with breathing and other techniques. AR 16.

**Interacting with others**—the ALJ found Ms. Stover to be "moderately" limited because she attended Narcotics Anonymous daily, she was pleasant, friendly, cooperative and presented with energy at Dr. Valette's evaluation.  Id.  She noted that Ms. Stover sometimes appeared anxious, sad, depressed and tearful during Dr. Parker's mental status exam.  Id.  However, the ALJ also found that Ms. Stover's testimony that she is a regional Alcoholics Anonymous representative was incompatible with "marked" limitations in this area.  Id.

**Concentrating, persisting or maintaining pace**—the ALJ found Ms. Stover had a "moderate" limitation in this area because Dr. Valette's evaluation found she could follow the storyline of a full-length movie, and although she seemed scattered at times, her thought process was organized and clear and she was able to come back to the topic at hand.  Id. (citing AR 670).  The ALJ noted Dr. Parker's records documented ongoing distraction related to staying sober, and ruminations, but also normal thought processes and improvement with breathing techniques.  AR 16 (citing AR985-1236).

**Adapting or managing oneself**—the ALJ found Ms. Stover had "moderate" limitation in this area based on Ms. Stover's hearing testimony that she attends to her own self-care and maintains her own household.  AR 16.  The ALJ also noted that Dr. Parker's notes demonstrate ongoing distraction related to staying sober.  Id. (citing AR 985-1236).

The above analysis by the ALJ and the evidence cited support the ALJ's determination of only "mild" and "moderate" limitations on Ms. Stover's functioning as a result of her mental impairments.  None of the evidence shows "extreme" or "marked" limitations.

In arguing that the ALJ erred at step three, Ms. Stover repeatedly discusses evidence from 2013.  Docket No. 33 at pp. 5-7 (citing to AR 500-08); Docket No. 40 at pp. 2-3 (citing to AR 500-08, 515-16 and 695-97).  But this

evidence was *before* the alleged onset date of disability, which was March 16, 2014, as Ms. Stover herself acknowledges.  AR 11, Docket No. 33 at p. 6 (top of page).  The task for the ALJ was to evaluate whether Ms. Stover was disabled between March 16, 2014, and September 30, 2020.  AR 12.  Thus, the relevant evidence must fall between those dates.  In any case, the April 1, 2013, intake needs assessment from Behavior Management Systems (BMS) to which Ms. Stover makes reference, documents her mental impairments, but also says she was able to maintain employment for the preceding eight months.  AR 515-16, 693-97.  This employment would not be consistent with "extreme" or "marked" limitations on Ms. Stover's functioning.

Ms. Stover also cites AR 276-77, 285, 291, which shows her wage earnings.  But these documents, in and of themselves, do not demonstrate "extreme" or "marked" limitations in mental functioning.  They merely establish that Ms. Stover did not work, or worked very little, but they do not establish *why* she did not work or whether she *was able* to work but did not do so.

Ms. Stover also relies on her own self-reported ability to function in support of her step three argument.  AR 333-39, 364-68.  In those self-reports, Ms. Stover stated a typical day would find her reading, eating, watching movies, going for a walk, napping, cleaning, and showering.  AR 333.  She stated she used alarms and notes to remind herself of tasks that needed to be done.  AR 334.  She stated she prepared her own meals on a daily basis.  Id. She did her own laundry and cleaning.  Id.  She stated she did not drive because she did not have a car, AR 335; however, by the time of the second

hearing before the ALJ, she was driving daily.  AR 101.  She described shopping for her own food, clothes, and beauty aids, spending about two hours a week on such activity.  Id.  She stated she could handle her own checking and savings accounts and count change.  Id.  She was able to go places without having to be reminded to go and without needing someone to accompany her.  AR 336.

She stated she could pay attention for 30 minutes and could follow written and oral instructions.  AR 337.  She got along great with authority figures.  AR 338.  She could handle changes in routine.  Id.  These self-reported activities and limitations are not consistent with "extreme" or "marked" limitations as defined above.

Ms. Stover also cites to AR 943-44.  This is a July 8, 2014, discharge summary from BMS saying they admitted Ms. Stover for treatment on April 1, 2013, and that she was being discharged because she was frequently absent and when attempts were made to re-engage her, she would participate for a brief time and drop out again.  The discharge summary indicated Ms. Stover was frequently using drugs at this time.

The final record Ms. Stover cites to in support of her step three argument is AR 1129-31, the documented results of psychological testing conducted by Dr. James B. Parker on May 28, 2019, specifically for use in Ms. Stover's Social Security disability application.  Dr. Parker noted that, at the time, Ms. Stover was working at a bar at night.  AR 1129.

Dr. Parker administered the Minnesota Multiphasic Personality Inventory-2 test.  AR 1129.  Dr. Parker wrote that the results of the MMPI-2 were invalid because the exaggeration score on Ms. Stover's test was extremely high.  AR 1130.  Dr. Parker diagnosed Ms. Stover with generalized anxiety disorder, multiple substance use disorder and post-traumatic stress disorder. AR 1131.  He recommended that she consider limited hours of work during daylight hours for a period of six to 12 months so as not to relapse on her sobriety.  Id.

Dr. Parker subsequently rendered a medical statement of Ms. Stover's mental ability to perform work-related activities.  AR 939-42.  In that statement, Dr. Parker rated Ms. Stover's impairments at either mild, moderate or none; he rated none of her impairments to be marked or extreme.  Id.

The court notes that, as of May 1, 2020, Ms. Stover had obtained full-time employment as a clerk in a county courthouse.  AR 101-02.

The ALJ considered Dr. Parker's record at step three (AR 16), but did not find Ms. Stover's level of impairment of functioning to be "extreme" or "marked."  This conclusion is supported by the evidence in the record as a whole.

Again, "extreme" limitations in functioning at step three under paragraph B criteria requires a finding that the claimant cannot function in this area independently, appropriately, effectively, and on a sustained basis while "marked" limitations requires a finding of a serious limitation on a sustained basis.  Listing § 12.00.F.2.d & e.  Dr. Parker noted that Ms. Stover was

24

currently holding down a job and that she could work limited hours for six to 12 months before returning to full-time employment. AR 1119, 1131. This opinion by Dr. Parker is not consistent with extreme or marked limitations. Dr. Parker explicitly opined that Ms. Stover's mental impairments were either mild, moderate, or "none" and that none of her mental impairments were marked or severe. AR 939-41.

The court concludes the ALJ's determination that Ms. Stover's mental impairments failed to meet paragraph B criteria is supported by the evidence in the record. This court will not overturn that conclusion.

### b.  Paragraph C Criteria

To meet the paragraph C criteria, Ms. Stover must show that she had a "serious and persistent" mental disorder—i.e. one that was medically documented and lasted for at least two years. Listing § 12.00.G.2.a. In addition, the claimant must show that she met both paragraph C1 criteria and paragraph C2 criteria. Id.

Paragraph C1 criteria requires showing that the claimant relies on an ongoing basis on medical treatment, mental health therapy, psychosocial supports or a highly structured setting to diminish the signs and symptoms of her mental disorder. Id. § 12.00.G.2.b.

Paragraph C2 requires the claimant to show that despite her diminished signs and symptoms, her adjustment is only marginal. Id. § 12.00.G.2.c. Marginal adjustment means the claimant's adaptation to the demands of daily life is fragile and she has minimal ability to adapt to changes or new demands.

Id.  Evidence such as the fact that a claimant had to be hospitalized, could not work, or was unable to leave her home are evidence of fragile and marginal adjustment.  Id.  Ms. Stover argues the evidence shows she had a serious and persistent mental disorder lasting over two years and that she had a marginal adjustment.  Docket No. 33 at p. 5.  She does not point to any specific evidence in the record in support of the assertion that she meets the paragraph C2 criteria nor does she argue that she meets paragraph C1 criteria.

The ALJ found Ms. Stover did not meet the criteria of paragraph C. AR 17.  The ALJ relied on the evidence that Ms. Stover walked 3-5 miles per day, maintained her own house, prepared her own meals, did odd jobs, and was the regional Alcoholics Anonymous representative.  Id.

To meet paragraph C2 criteria, Ms. Stover must show she had only marginal adjustment—that her adaptation to the demands of daily life was fragile and she had minimal ability to adapt to changes or new demands. Listing § 12.00.G.2.c.  By her own admission in her self-described function report, Ms. Stover reported she had a "good" ability to adapt to changes in her routine.  AR 338.  She also stated she was able to handle all the daily activities of caring for herself and her home, including shopping, handling money, paying attention, and following written and oral instructions.  AR 333-37.  She coached a fourth- and fifth-grade basketball team two nights a week.  AR 74-75.  This does not meet the definition of "marginal adjustment" needed to meet

paragraph C2 criteria.[8]  The ALJ's decision as to paragraph C criteria is

supported by the record and will not be overturned by this court.

### 3.     Whether the ALJ Erred in Formulating the RFC

A claimant's RFC represents "the most a claimant can do despite [her]

limitations."  Boyd v. Colvin, 831 F.3d 1015, 1020 (8th Cir. 2016).  The ALJ

formulated the following RFC for Ms. Stover:

> [Ms. Stover could] perform light work . . . such that she can push,
> pull, lift, or carry 20 pounds occasionally and 10 pounds
> frequently.  In an 8-hour workday, she can stand and/or walk for
> 6 hours and sit for 6 hours.  She can never crawl or climb ladders,
> ropes, or scaffolds, but she can frequently balance, stoop, kneel,
> crouch, or climb ramps or stairs.  She can have no exposure to
> noise levels greater than moderate . . .; bright or flickering lights,
> such as produced by welding; unprotected heights; moving
> mechanical parts; or other workplace odors, fumes, gases, or other
> pulmonary irritants.  She can perform low-stress jobs defined as
> requiring understanding, remembering, and ability to carry out
> only simple, routine tasks involving only simple work-related
> decisions and no more than occasional changes in the routine
> work setting and job duties.  She can have no high production-rate
> requirements but she can have a quota requirement, so long as
> she can control the pace of the work.  She can have brief,
> superficial contact with the public (e.g., she can do no problem-
> solving for customers).

AR 17.

The court notes this RFC incorporated many limitations due to

Ms. Stover's impairments.  The ALJ provided no exposure to environmental

conditions that might affect her COPD.  In consideration of her mental

impairments, the ALJ provided the jobs should be low stress and require less

---

[8] Because Ms. Stover is required to meet both C1 and C2, the fact that she did
not meet C2 means she cannot satisfy the C criteria.  Therefore, court need not
address the C1 criteria.

concentration, persistence, pace and attention than average. Finally, the ALJ appropriately limited Ms. Stover's interactions and contact with the public and provided that she not be subjected to frequent changes in her job routines, work setting or duties.

It is not clear to the court that Ms. Stover is alleging any error was committed by the ALJ with regard to the RFC formulation. She asserts that she was unable to work, much less perform the jobs of turner, marker, or garment sorter, between the dates of March 16, 2014, through April 12, 2017/2018[9], because she was suffering a complete mental breakdown at this time. Docket No. 33 at pp. 7-8. Also, Ms. Stover repeatedly asserts the ALJ erred by not adopting the opinion of "vocational expert" "Mr. Valette" that there were no jobs available in the national economy which Ms. Stover could perform. Id. at p. 8. But the vocational expert who testified at the first hearing was Ms. Anne Arrington (AR 83) and the vocational expert who testified at the second hearing was Jerry Gravatt (AR 112).

Brett Valette was a consultative psychologist who examined Ms. Stover on December 21, 2016, which is in the middle of the time period Ms. Stover asserts she was suffering from a complete mental breakdown. AR 669; Docket No. 33 at p. 8. Dr. Valette noted Ms. Stover had never been admitted to a psychiatric hospital, was not taking any psychiatric medications at that time, and was not in therapy at that time. AR 670. Ms. Stover told Dr. Valette that

---

[9] Ms. Stover uses both 2017 and 2018 as the end-date of her asserted period of disability when writing about that subject in her brief. See Docket No. 33 at p. 8 (first and last paragraphs on that page); and p. 9 (top paragraph).

she was not depressed currently, that she was "doing okay," that her appetite was good and her weight stable.  Id.  She told Dr. Valette that she was not experiencing any PTSD symptoms and that her past abuse "really does not affect [her] now."  Id.  She denied that she experienced any psychotic process, and she had not experienced any suicidal thoughts "for at least a couple of years." Id.

Dr. Valette administered some tests and found Ms. Stover could recall three items on short term memory and two items after five minutes; on serial 7s she could count 100 down to 51 correctly without a mistake within 30 seconds; she could spell "world" forwards and backwards correctly; she handled her own money and bills; she had a driver's license and could drive; and she responded to a number of questions accurately and appropriately.  AR 671.

Ms. Stover told Dr. Valette she lived in an apartment by herself and did all her chores independently including cooking and cleaning, laundry, grocery shopping, dressing and bathing.  AR 670.  She watched TV and movies and could follow the story lines.  Id.  She liked reading history books and novels.  Id.  There is nothing in Dr. Valette's report that would support Ms. Stover's assertion that he opined she was unable to work.  Conversely, Dr. Valette's opinion supports the ALJ's RFC formulation.

Now, in her brief filed in this litigation, Ms. Stover attempts to undermine Dr. Valette's opinion and her own statements to him at the time by arguing that she was "in denial" during her examination by Dr. Valette.  Docket No. 33

at p. 4.  This commentary is extra-record, unsworn statements and is not considered by the court when determining the core question presented by this appeal: whether the ALJ's decision is supported by the administrative record.

Vocational experts Mr. Gravatt and Ms. Arrington did opine that if the hypothetical claimant were to miss more than two days of work per month, there were no jobs the claimant could perform.  AR 89, 115.  However, those experts provide no support for the assertion that *Ms. Stover* would miss two or more days of work per month due to her impairments.  Especially given the mental status documented by Dr. Valette, the court finds no support in the record that Ms. Stover would be required to miss two or more days of work each month.[10]

Ms. Stover also asserts that her COPD would have rendered her disabled even without the mental impairments.  Docket No. 33 at p. 8.  She points to records from Dr. Luis Robels that her COPD rendered her unable to work from June 24, 2014, until September 15, 2014.  Id. (citing AR 548).  But these records, taken at face value, show only a temporary work disability for a period of approximately three months, not one that prevented Ms. Stover from working for 12 months or more.

---

[10] Ms. Stover asserts in her reply brief that she in fact was having migraines that would have caused her to miss work two or more days a week.  Docket No. 40 at p. 6.  However, this is not documented in the medical records and Ms. Stover herself did not testify to this at the ALJ hearing.  At the hearing, she testified her migraines got down to one a month or sometimes even longer than a month.  AR 110.  This is one of those instances of "new evidence" Ms. Stover attempts to insert into the record.  For reasons explained previously, this court must confine itself to examining the evidence that was before the ALJ, not evidence asserted for the first time in this lawsuit.

Looking behind the face value of Dr. Robels' note, there is some question whether there was a basis for Dr. Robels to state Ms. Stover was unable to work from June 24, 2014 to September 15, 2014.  The record cited by Ms. Stover is part of a three-page record of a doctor visit she made to Dr. Robels on September 8, 2014.  AR 548-550.  There are no records from Dr. Robels between the dates of June 24, 2014, and September 8, 2014.  If Dr. Robels had no appointments with Ms. Stover during the relevant time period, what evidence did he have to base this opinion on?

Ms. Stover did report to the emergency room on August 8, 2014, complaining of difficulty breathing for the five previous days (i.e. since August 3, 2014).  AR 597-99.  The court finds little evidence in the record to support Dr. Robels' opinion that Ms. Stover was unable to work during the approximately 9-week time frame from June 24, 2014 to August 3, 2014, due to her respiratory impairment.  Nonetheless, as noted, even taking Dr. Robels' note at face value, it does not demonstrate an impairment that prevented Ms. Stover from working for 12 months or more.

Ms. Stover again points to the opinion of Dr. Parker from June 17, 2019, remarking that Ms. Stover should not work at night as she was then doing (at a bar), and should not work full time for the next six to nine months.  Docket No. 33 at p. 9 (citing AR 1130-31).  Dr. Parker's assessment was discussed at length above in the step three analysis.  To reiterate, Dr. Parker administered the MMPI-2 test and found the results of that test to be "not statistically valid or viable" due to the extremely high exaggeration score.  AR 1130.  To the

extent Dr. Parker's work recommendations for Ms. Stover are made based on the results of the MMPI-2, those recommendations are similarly unreliable. But even taking Dr. Parker's recommendation at face value, it does not establish an inability to work due to disability lasting for 12 months or more.

The court concludes that the ALJ's RFC formulation is supported by substantial evidence in the record as a whole.  Accordingly, the court will not overturn that determination.

### 4.    Whether the ALJ Erred in Identifying Jobs Ms. Stover Could Perform Given her RFC

Ms. Stover does raise an argument that she is unable to perform the jobs identified by the ALJ at step five.  However, she does not take issue with any of the specific requirements of those jobs.  Rather, her argument is that she was unable to perform *any* job due to a complete mental breakdown between March 16, 2014, and April 12, 2017/18, and the asserted accompanying need to miss work two or more days per month because of that breakdown.  Docket No. 33 at pp. 8-9.  As already discussed above, the court rejects that argument and finds the ALJ's decision was supported by the record.

### CONCLUSION

Based on the foregoing facts, law, and analysis, it is hereby

ORDERED that Ms. Stover's motion to reverse the Commissioner's decision below [Docket No. 33] is DENIED and the Commissioner's motion to affirm the agency decision below [Docket No. 36] is GRANTED.

Despite ruling against Ms. Stover on the issue of whether she qualified for disability, the court wishes to commend Ms. Stover for her

accomplishments.  It is a testament to her perseverance that she overcame her addictions and the effects of past trauma, that she continued to strive to better herself, achieving a leadership role in Alcoholics Anonymous so that she could help others, obtaining gainful employment in May, 2020, keeping herself mentally and physically fit through expending efforts in those areas.  The court also wishes to commend Ms. Stover on her representation of herself in this litigation.  Social Security law is complex, and Ms. Stover did an admirable job mustering the law and the administrative record to make her arguments.  The court wishes her well in her future endeavors.

      Dated September 12th, 2022.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge

33